UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| FARM BUREAU LIFE INSURANCE COMPANY,<br><br>Plaintiff/Counter-Defendant,<br><br>vs.<br><br>AARON J. BRADLEY, individually and as co-personal representative of the Estate of John A. Bradley, and MEGAN C. BURKS, as co-personal representative of the Estate of John A. Bradley,<br><br>Defendants/Counter-Claimants. | Case No.: 1:20-cv-00254-REP<br><br>**MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Dkt. 40)** |

Pending is Plaintiff/Counter-Defendant Farm Bureau Life Insurance Company's Motion for Summary Judgment (Dkt. 40). All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. Dkt. 16. Because the evidence presents a genuine dispute of material fact regarding John A. Bradley's competency to surrender his life insurance policy – the dispositive legal issue in this case – the Court denies Farm Bureau's motion.

## BACKGROUND

This case centers on a dispute over life insurance benefits. On December 26, 1997, Plaintiff/Counter-Defendant Farm Bureau Life Insurance Company issued a variable life insurance policy to John A. Bradley, the father of Defendants/Counter-Claimants Aaron J. Bradley and Megan Burks. *See* Pl.'s Stmnt of Facts ¶ 1 (Dkt. 40-2).[1] The death benefits on this policy originally amounted to $250,000. *Id.*

Subject to certain restrictions not relevant here, the policy permitted John Bradley to "surrender all or a portion of the net cash value" of the policy at his discretion. *Id.* ¶ 2; *see also*

---
[1] Unless otherwise noted, all the factual citations are to undisputed facts.

**MEMORANDUM DECISION AND ORDER - 1**

Policy Excerpts § 7.12 (Dkt. 40-4).  The policy warned, however, that surrendering the entire net cash value would result in termination of the policy.  Pl.'s Stmnt of Facts ¶ 2 (Dkt. 40-2); *see also* Policy Excerpts §§ 2.10(d) and 7.12(i) (Dkt. 40-4).  The policy also allowed policy holders to take out cash loans against the policy when there was a net cash value.  Policy Excerpts § 8.1 (Dkt. 40-4).

Between 2007 and 2017, John Bradley applied for and received seven loans against his policy and two partial cash surrenders, thereby reducing the value of his policy.   Pl.'s Stmnt of Facts ¶¶ 3-9. 11-12 (Dkt. 40-2).

In August 2018, John Bradley suffered a heart attack.  Decl. of Robert F. Calhoun, Ph.D. ¶¶ 9-11 (Dkt. 45-2) and Decl. of James Davidson, Ph.D. ¶ 12 (Dkt. 46).  Over the next five months, John Bradley was admitted to the hospital on several occasions for various medical issues, including hitting his head after falling, acute and chronic renal failure, and congestive heart failure.  Decl. of Robert F. Calhoun, Ph.D. ¶¶ 12-17 (Dkt. 45-2) and Decl. of James Davidson, Ph.D. ¶ 12 (Dkt. 46).

On January 30, 2019, John Bradley called Farm Bureau and indicated that he had recently had some significant health problems and would like to discuss withdrawing capital against his policy.  *See* Pl.'s Stmnt of Facts ¶ 13 (Dkt. 40-2).  At that time, John Bradley was residing in a care facility called Countryside Care and Rehab.  Def.'s Stmnt of Facts ¶ 4 (Dkt. 43-1).  A phone representative for Farm Bureau informed John Bradley that there was not enough cash value in the policy for a partial surrenderer or a loan.  Pl.'s Stmnt of Facts ¶ 13 (Dkt. 40-2).  The representative, however, provided Mr. Bradley with the total cash value should he elect to terminate the policy.  *Id.*

John Bradley called Farm Bureau on the phone another four times, once on February 22, 2019 and three times on February 25, 2019, to further discuss obtaining cash from his policy.  *Id.*

**MEMORANDUM DECISION AND ORDER - 2**

¶¶14-15; *see also* Decl. of Denise Moore ¶¶ 17-20 (Dkt. 40-3) and Pl.'s Exhs. O-R (Dkt. 40-6). In these calls, Mr. Bradley was consistently informed that there was not a sufficient net cash value for a loan or partial surrender. *Id.* He was advised of his ability to cash out the remaining value of the policy with a full surrender. *Id.*

Armed with this information, John Bradley called Farm Bureau on February 26, 2019. He explained that he wanted to sign a surrender form and asked that Farm Bureau fax him the appropriate form. Pl.'s Exh. S (Dkt. 40-6).

John Bradley received, completed, signed, and returned the surrender form to Farm Bureau that same day. Pl.'s Stmnt of Facts ¶ 16 (Dkt. 40-2). In the portion of the form stating whether he was requesting a full or partial surrender, John Bradley checked that he wanted a full surrender in exchange for the net cash value. *See* Surrender Form (Dkt. 40-7 at 3). The form explained that this surrender would "terminate" Farm Bureau's liability under the policy and release them from any further obligations, other than payment of the net cash value. *Id.* After he faxed this form to Farm Bureau, John Bradley called the company to confirm they had received the form and ensure his automatic payments on the policy would be canceled. Pl.'s Stmnt of Facts ¶ 18 (Dkt. 40-2).

Farm Bureau promptly processed the surrender on February 28, 2019, issuing John Bradley a check for $719.59. *Id.* ¶ 19. This check was mailed to the address on file. Pl.'s Stmnt of Facts ¶ 19 (Dkt. 40-2), Pl.'s Exhs. N-R, T (Dkt. 40-6).[2] After the check was issued, John Bradley called Farm Bureau to ask that the check be sent to a different address as he had moved.

---

[2] Defendants represent that this was the address for John Bradley's former law office. Def.'s Stmnt of Facts ¶ 12 (Dkt. 43-1). The evidence Defendants cite to support this assertion, however, does not include the address for Mr. Bradley's law office. Depo. of Aaron Bradly at 20:1-15 (Dkt. 43-3, Pages 56-59). Out of an abundance of caution, the Court will not rely on this minor fact in resolving the pending motion for summary judgment.

**MEMORANDUM DECISION AND ORDER - 3**

Pl.'s Stmnt of Facts ¶ 19 (Dkt. 40-2). Farm Bureau informed Mr. Bradley that the check had already been mailed to his old address and Mr. Bradley responded that he would work it out. *Id.*

While seemingly unlikely, it is unknown whether the check ever made its way to John Bradley.[3] What is undisputed is that Mr. Bradley never cashed the surrender payout. Pl.'s Stmnt of Facts ¶¶ 23, 26 (Dkt. 40-2).

In late March 2019, John Bradley's daughter, Megan Burks, and his son-in-law, Jared Burks – unaware that the policy had been canceled – sent Farm Bureau $900 in an attempt to pay the premiums on Mr. Bradley's insurance policy. *Id.* ¶ 21. Farm Bureau returned the check to Mr. Bradley's old address with a note that the policy had been terminated. *Id.*; *see also* March 25, 2019 Correspondence (Dkt. 40-7 at 7).

This did not stop John Bradley's daughter and son-in-law from submitting more payments on the policy. On June 28, 2019 and September 26, 2019, John Bradley's family sent two additional $900 checks to be applied to Mr. Bradley's life insurance policy. Pl.'s Stmnt of Facts ¶¶ 22, 24 (Dkt. 40-2). Farm Bureau returned both checks. *Id.*

On September 29, 2019, John Bradley died. *Id.* ¶ 25. At some point thereafter, Defendants informed Farm Bureau that they believed their father's cancellation of the policy was invalid because he was incompetent, and they demanded that Farm Bureau pay death benefits on the policy. Compl. at 2 (Dkt. 1). Farm Bureau refused and this lawsuit followed. *Id.*

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[3] John Bradley called Farm Bureau one final time on March 4, 2019, to inquire about the status of the check. Farm Bureau informed Mr. Bradley it had been sent out on February 28, 2019, and should arrive at his old address shortly. *Id.* ¶ 20; Pl.'s Exh. V (Dkt. 40-6).

**MEMORANDUM DECISION AND ORDER - 4**

R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id*. at 252.

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party.  *Id*. at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing evidence in the light most favorable to the nonmoving party, we must determine whether there any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000)).  The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

## **THE LAW REGARDING COMPETENCY TO CONTRACT**

In Idaho, three companion statutes govern the enforceability of contracts involving persons lacking mental capacity: Idaho Code §§ 32-106 through 32-108.

- Idaho Code § 32-106 provides that "[a] person entirely without understanding has no power to make a contract of any kind, but he is liable for the reasonable value of things furnished to him necessary for his support or the support of his family." I.C. § 32-106.

- Idaho Code § 32-107 provides "[a] conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission." I.C. § 32-107.

**MEMORANDUM DECISION AND ORDER - 5**

- Finally, Idaho Code § 32-108 provides "[a]fter his incapacity has been judicially determined, a person of unsound mind can make no conveyance or other contract, nor delegate any power or waive any right until his restoration to capacity." I.C. § 32-108.

The Idaho Supreme Court has held that these three statutes must be construed together. *Rogers v. Household Life Ins. Co.*, 150 Idaho 735, 737 (2011). Viewed through this lens, the Idaho Code creates tiered standards of contract enforceability based on the level of a person's understanding and whether or not that person has been adjudicated incompetent prior to contracting. *See id.* at 738.

Relevant here, when a person of unsound mind, but not entirely without understanding, enters a contract prior to being adjudicated incompetent, the Idaho legislature has directed that the contract is voidable. *Id.*; *see also* I.C. § 32-107.

A proceeding to invalidate such a contract, like all proceedings involving the competency of an individual to execute a contract, "start[s] with [a] presumption of competency." *Olsen v. Hawkins*, 90 Idaho 28, 33 (Idaho 1965). This presumption may be relied upon by the Court and the other party to the contract until incapacity is shown. *Id.* In other words, the burden is on the party seeking to void a contract under I.C. § 32-107 to prove incapacity. *Id.*

This is a substantial burden. Idaho case law is clear that old age and health problems alone are not enough to prove incompetency. *Olsen*, 90 Idaho at 33 ("where a person possesses sufficient mental capacity to understand the nature of the transaction and is left to exercise his own free will, his contract will not be invalidated because he was of a less degree of intelligence than his co-contractor; because he was fearful or worried; because he was eccentric or entertained peculiar beliefs; or because he was aged or both aged and mentally weak"). This is because incompetency does not rest on a showing of emotional or intellectual decline. In

**MEMORANDUM DECISION AND ORDER - 6**

determining whether someone is competent to enter a contract, the relevant question is not how savvy that person once was, but whether, that person retains, at the time the contract is entered, "sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the [particular] act or transaction." *Id.*

## DISCUSSION

A. **The right to rescind a contract under I.C. § 32-107 is predicated entirely upon incapacity, not upon the other party's knowledge of that incapacity.**

The first and primary issue presented by Farm Bureau's motion for summary judgment is a legal one: under what conditions does Idaho law permit a mentally incompetent person to rescind the cancellation of a life insurance policy?

Relying on policy arguments and out-of-state case law, Farm Bureau asserts that the estate of a mentally incompetent individual should only be permitted to rescind the cancellation of a life insurance policy if one of two conditions are met: (1) the person was adjudicated incompetent prior to the cancellation or (2) the insurer knew of the alleged lack of capacity or knew of facts which should have put it on inquiry which, if followed up, would have led to knowledge of the lack of capacity. Pl.'s Rply at 2 (Dkt. 45). This position is not grounded in the plain language of I.C. § 32-107.

As outlined above, I.C. § 32-107 permits the rescission of the "conveyance or other contract of a person of unsound mind," without any reference to the knowledge or mental state of the other party to the contract. I.C. § 32-107. Here, there is no serious dispute that Mr. Bradley's surrender of his life insurance policy qualifies as a "conveyance or other contract." The form Mr. Bradley signed to cancel his policy states:

> This surrender shall not take effect until this form and policy, if required, are received by the Company, but when so received the Company's liability under the policy, except for payment of the net cash value, shall cease and terminate. In consideration of the payment of the net cash value, I acknowledge that all rights,

**MEMORANDUM DECISION AND ORDER - 7**

>claims, benefits, and demands under the policy are fully settled and satisfied and the Company is hereby released from any and all liability.

Surrender Form (Dkt. 40-7 at 3). As Farm Bureau acknowledged at the February 24, 2022 motion hearing, this surrender involved an offer, acceptance and consideration. *See Pacific States Life Ins. Co. v. Bryce*, 67 F.2d 710, 712 (10th Cir. 1933) (a surrender clause that gives the insured the right cancel a policy is an irrevocable continuing offer from the company, which becomes a binding contract once accepted by the insured).[4] By signing and submitting this form, therefore, Farm Bureau agrees that Mr. Bradley completed a binding, contractual act. *See* Pl.'s MSJ at 5-6 (Dkt. 40-1).

This view accords with Idaho law. *See Olsen*, 90 Idaho at 32 (treating an insured's change of beneficiary on a life insurance policy as a contractual act that may be rescinded if the insured was of unsound mind when the change was made). It follows that I.C. § 32-107 governs the outcome of this case.

The only remaining question is whether the Court should read a silent knowledge requirement into § 32-107 to protect insurance companies in situations where they are obliged to "abide by the proper requests of [their] insureds under the policy contract." Pl.'s Rply at 3 (Dkt. 45). Farm Bureau makes a variety of policy arguments as to why this rule is preferable to a rule that allows beneficiaries to challenge the cancellation of an insurance policy by asserting incapacity of the insured after that person's death. Pl.'s MSJ at 11-13 (Dkt. 40-1). For example,

---

[4] *See also Lutwak v. Mut. Life Ins. Co. of N.Y.*, No. 85 C 7139, 1986 WL 3602, at *1 (N.D. Ill. Mar. 18, 1986) (same); *Farmers Bank & Cap. Tr. Co. of Frankfort, Kentucky v. Nw. Mut. Life Ins. Co.*, 891 S.W.2d 413, 416 (Ky. Ct. App. 1995) (same); *Taylor v. Bonilla*, 801 S.W.2d 553, 560 (Tex. App. 1990) (same); *Hays v. Fid. Ind. Credit Co. of Ogden*, 549 P.2d 701, 702 (Utah 1976) (same); *Occidental Life Ins. Co. of Cal. v. Templeton*, 219 Ga. 39, 42, 131 S.E.2d 530, 533 (1963) (same); *Pack v. Progressive Life Ins. Co.*, 239 Mo. App. 1, 9, 187 S.W.2d 501, 505 (1945) (same); *Lauer v. Michigan Life Ins. Co.*, 268 Mich. 614, 618, 256 N.W. 567, 568 (1934) (same).

**MEMORANDUM DECISION AND ORDER - 8**

Farm Bureau stresses that it is contractually obligated to terminate a policy and pay the net surrender value upon the request of the insured. *Id.* at 12. Farm Bureau argues that if it cannot rely on these surrenders to be binding it and other insurance companies will be forced to conduct onerous investigations into the competency of insureds. *Id.* Farm Bureau also complains that any decisions it makes about competency prior to termination may expose Farm Bureau to bad faith claims. *Id.* at 12-13. At the motion hearing, Farm Bureau argued that these burdens are particularly onerous in cases, like this one, where the insurance company is not alerted to issues of competency until after the death of the insured.

While focusing primarily on the plain language of the Idaho Code and associated case law, Defendants also present their own competing policy arguments regarding the interests of insureds and the incentives of insurance companies. Def.'s Rsp. at 10-11 (Dkt. 43). Most compellingly, at the motion hearing, Defendants pointed out that Idaho Code §§ 32-106 through 32-108 are designed to protect the interests of incompetent individuals. To further this goal, these statutes necessarily and unavoidably impose costs on those who contract, unwittingly or otherwise, with people who are incapacitated. These costs are not unique to insurance companies. Nor are they one-sided. As Defendants recognize, it is their burden to establish incapacity at trial. This can be a costly endeavor, not without its own risk.[5] In short, Defendants contend that the Idaho Code already represents an appropriate, society-wide balance between the interests of incompetent people and those with whom they contract.

---

[5] In this case, for example, Farm Bureau has already made a claim that it will be entitled to attorney's fees should it prevail. Compl. at 8 (Dkt. 1) (citing Idaho Code §§ 10-1210, 12-121, 12-123).

**MEMORANDUM DECISION AND ORDER - 9**

Reasonable minds could disagree about the merits of these respective policy positions. It is not this Court's place, however, to resolve this dispute or impose, onto the Idaho public, the Court's personal views regarding how to best regulate the insurance industry.

Where the language of a statute is unambiguous, the Court must "give effect to the legislature's clearly expressed intent," without entertaining policy arguments designed to amend this language. *Rogers*, 150 Idaho at 739. This is a firm prohibition that operates even, or especially, when significant interests are at stake. In *Rogers*, for example, the Idaho Supreme Court faced a request to amend the strict language of § 32-108 to allow the Court to uphold a contract that benefited someone adjudicated incompetent and was later ratified by that person's guardian. *Id.* at 736, 739. The Idaho Supreme Court rejected this request, reasoning that "policy arguments for altering unambiguous statutes must be advanced before the legislature," not the courts. *Id.* at 739.

The same reasoning applies here. By adopting I.C. § 32-107, the Idaho legislature opted to provide certain, specified safeguards to people of unsound mind, including the right to void any contracts they have entered. I.C. § 32-107. It is not this Court's role to rebalance the equities to reduce these protections in cases where the Court thinks the result is especially harsh to the other party to the contract. *Rogers*, 150 Idaho at 739.

In other words, Defendants are correct to focus on the language of the law, rather than empirical policy arguments about the harm to insurance companies, the interests of insureds, or the optimal framework for addressing issues of incapacity in the insurance industry. As Defendants argue, this language is fatal to Farm Bureau's position. First and foremost, the plain language of I.C. § 32-107 permits rescission of a contract without any reference to the knowledge or mental state of the other party to the contract. I.C. § 32-107; *see also Rogers*, 150 Idaho at 738 ("it is evident that the [Idaho] legislature intended that contracts involving persons

**MEMORANDUM DECISION AND ORDER - 10**

not adjudicated to be incapacitated are to be voidable"). Idaho case law strongly supports the conclusion that this silence is dispositive. *See Rogers*, 150 Idaho at 736, 739 (treating an insurance company's knowledge of the incompetency of an insured as irrelevant under § 32-108, which also contains no explicit knowledge requirement);[6] *see also Knowlton v. Mudd*, 116 Idaho 262, 264 (Idaho App. 1989) ("It is axiomatic that in order to form a valid agreement, each party must have the requisite mental capacity . . . the trial judge focused on the proper issue when he determined that Mrs. Provolt did not understand the contract amendment.").

California precedent further bolsters this reading of § 32-107. Unlike the state law cited by either party, California has an identical statute to § 32-107, on which § 32-107 was modeled. *See Ratliff v. Baltzer's Adm'r*, 13 Idaho 152, 155 (Idaho 1907) (explaining that Idaho's incompetency statutes were "taken bodily" from California). Idaho courts have, consequently, looked to California as persuasive precedent for how to interpret § 32-107. *See Fleming v. Bithell*, 56 Idaho 261, 266 (Idaho 1935) (following California's interpretation of its identical incompetency statutes). This precedent aligns with the view that § 32-107's omission of a knowledge requirement is binding on courts. *Neale v. Sterling*, 117 Cal. App. 507, 509, 4 P.2d 250 (Cal. Ct. App. 1931).

---

[6] In the reply, Farm Bureau attempts to distinguish *Rogers* on the basis that it involved an insured who was previously adjudicated incompetent, while this case involves someone who has yet to be adjudicated incompetent. Pl.'s Rply at 2-3 (Dkt. 43). In other words, Farm Bureau asks this Court to find that § 32-107 and § 32-108 contain different knowledge requirements. This argument does not hold water. Both statutes are equally silent regarding the knowledge of the party, here an insurance company, with whom an incapacitated person happens to contract. Because they are companion statutes, this silence should be treated similarly. *See State v. Casselman*, 69 Idaho 237, 245 (Idaho 1949) ("Similar expressions in civil and criminal statutes dealing with same general subject should be given uniform construction."); *see also St. Alphonsus Reg'l Med. Ctr. v. Elmore Cnty.*, 158 Idaho 648, 653 (Idaho 2015) (as a matter of statutory construction, courts should infer that statutes relating to the same subject matter are "governed by one spirit and policy" and are "intended to be consistent and harmonious in [their] several parts and provisions").

**MEMORANDUM DECISION AND ORDER - 11**

In *Neale*, as here, a company that unknowingly contracted with an allegedly incompetent woman argued that its lack of knowledge of the woman's incompetency should shield the company from the subsequent recission of the contract. *Id.* at 509. The California Court of Appeals summarily rejected this argument, holding that California's identical version of § 32-107 "confers upon an incompetent person the right to rescind a voidable contract made before a judicial determination of incompetency" and that this "right is entirely predicated upon incompetency at the time the contract was made and is not dependent upon knowledge of the incompetency or fraud on the part of the other party." *Id.* The Court considers *Neale* strong authority for how to best interpret § 32-107.

The out-of-state cases cited by Farm Bureau, by contrast, do not speak to the plain meaning of § 32-107. Specifically, Farm Bureau relies on case law from Alabama, North Carolina, and Washington to support its position that knowledge is a prerequisite to the recission of the cancellation of an insurance policy. Farm Bureau has not presented evidence, however, that any of these states have a statute like I.C. § 32-107.[7]

---

[7] Even if these states had comparable statutes, they do not present as strong a consensus as Farm Bureau suggests. While the Alabama case supports Farm Bureau's preferred position, the North Carolina and Washington cases are more nuanced. *See, e.g., Page v. Prudential Life Ins. Co. of Am.*, 12 Wash. 2d 101, 110, 120 P.2d 527, 532 (1942) (holding that a beneficiary – the wife of the deceased – was estopped from rescinding the surrender of an insurance policy where she "inferentially, if not actually, indicated [to the insurance company] that her husband was competent to manage any matter concerning the insurance") and *Chesson v. Pilot Life Ins. Co.*, 268 N.C. 98, 103, 150 S.E.2d 40, 44 (1966) (if an insured shows that he was not mentally competent to surrender an insurance policy, the insurer can, nevertheless, enforce the cancellation if the insurer proves that it was "(1) was ignorant of the mental incapacity; (2) had no notice thereof such as would put a reasonably prudent person upon inquiry; (3) paid a fair and full consideration; (4) took no unfair advantage of plaintiff; and (5) that the plaintiff has not restored and is not able to restore the consideration or to make adequate compensation therefor."). In other words, neither *Page* nor *Chesson* apply to the facts of this case. While Farm Bureau asserted estoppel as a defense in the answer, it has not raised this defense at summary judgment. Ans. at 5 (Dkt. 38). In addition, Farm Bureau has not shown, nor could it show, that Mr. Bradley's estate is unable to restore Farm Bureau to its original position prior to the

**MEMORANDUM DECISION AND ORDER - 12**

Finally, while the Idaho Supreme Court has not specifically addressed the recission of the surrender of an insurance policy under § 32-107, it has entertained a request to rescind a change of beneficiary under a life insurance policy. *Olsen*, 90 Idaho at 32. In *Olsen*, Idaho Supreme Court held that the test for determining whether a change of beneficiary on a life insurance policy was valid was whether the insured was competent to make the change at the time of the transaction. *Id.* at 33. Notably, the Supreme Court did not observe that the change of beneficiary involves an insured's exercise of his rights under an insurance contract or express concern that allowing belated challenges to such changes would risk exposing insurance companies to double liability after the death of an insured. Rather, the Court considered the former beneficiaries challenge under the same, well-settled standard that governs all proceedings involving the competency of an individual to execute a contract. *Id.* at 33. This approach casts serious doubt on Farm Bureau's argument that Idaho law on competency to contract contains implicit, specialized rules reflecting the unique features of the insurance industry.

In short, the plain language of § 32-107 and related Idaho case law all points in one direction: the test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the act or transaction in which he is engaged. Whether the other party to the contract had knowledge of this incapacity is irrelevant to the enforceability of such a contract under § 32-107.

**B. There is a genuine dispute of material fact regarding Mr. Bradley's competency to surrender his insurance policy.**

As the briefing has unfolded, the issues raised by Farm Bureau's motion for summary judgment have expanded. In its original motion, Farm Bureau only asked the Court to grant

---

cancellation of his policy as would be required to enforce Mr. Bradley's cancellation under North Carolina law. *See Chesson,* 268 N.C. at 103.

**MEMORANDUM DECISION AND ORDER - 13**

summary judgment on the basis that it lacked knowledge of Mr. Bradley's alleged incapacity. *See generally* Pl.'s MSJ (Dkt. 40-1).  After Defendants presented evidence regarding that incapacity, however, Farm Bureau filed a reply contesting whether Defendants had adduced sufficient evidence of Mr. Bradley's incompetence to create a genuine issue of material fact for trial.  Pl.'s Rply to MSJ at 8-10 (Dkt. 45).  At the motion hearing, Farm Bureau acknowledged that it did not originally raise this issue because of the competing evidence regarding Mr. Bradley's mental state.

Farm Bureau's initial hesitation was correct.  Generally speaking, whether a contracting party had sufficient mental capacity to enter a particular contract "is a question of fact to be determined by the trier of the facts."  *Phillips v. E. Idaho Health Servs.*, 166 Idaho 731, 756 (Idaho 2020).  The Court may only resolve such matters on summary judgment where, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to how a fact-finder would decide the issue, i.e., where no reasonable trier of fact could resolve the facts differently.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (a factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

This case involves a classic issue of disputed fact under these standards.  As outlined in their response, Defendants have highlighted a variety of evidence from which a reasonable fact-finder could conclude that Mr. Bradley lacked the capacity to understand the cancellation of his insurance policy.  Def.'s Rsp. at 7-9 (Dkt. 43).  For example, Defendants have submitted a declaration from an expert opining that Mr. Bradley did not possess sufficient mental capacity at the time the insurance policy was surrendered to understand the nature, extent, character, and effect, of the contract.  Decl. of James Davidson, Ph.D. ¶¶ 110-115 (Dkt. 46).  Farm Bureau

**MEMORANDUM DECISION AND ORDER - 14**

argues that this declaration is too speculative to be reliable. Pl.'s Suppl. Br. at 3 (Dkt. 53). But this argument is misdirected.

While the Court may exclude the testimony of an expert as unreliable at summary judgment under Federal Rule of Evidence 702,[8] Farm Bureau has not filed a motion seeking such relief. Given this decision, the Court must assume for the purposes of ruling on this Motion that Dr. Davidson's proposed testimony will be admissible at trial. *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (2014). That presumption is fatal to Defendant's argument. "After an expert establishes admissibility to the judge's satisfaction, challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Pyramid Techs.*, 752 F.3d at 814.

Even if the Court could disregard Dr. Davidson's declaration, the outcome would not change. Defendants have also presented statements from family, friends, and medical providers who interacted with Mr. Bradley at or around the time of the surrender. Def.'s Rsp. at 7-9 (Dkt. 43). Idaho courts have long treated this type of evidence as "substantial and competent evidence" of incompetency. *See, e.g., McPheters v. Hapke*, 94 Idaho 744, 746 (Idaho 1972) (holding that there was sufficient evidence to support a finding of incompetency where there was testimony, among other things, that the deceased was very senile, appeared at times unaware that

---

[8] *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1288 (11th Cir. 2005) (affirming a grant of summary judgment on grounds that plaintiff failed to prove causation after the plaintiff's expert was excluded under Daubert); *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("The Daubert regime can play a role during the summary judgment phase of civil litigation. If proffered expert testimony fails to cross Daubert's threshold for admissibility, a district court may exclude that evidence from consideration when passing upon a motion for summary judgment.").

**MEMORANDUM DECISION AND ORDER - 15**

his wife had died, often confused the past and the present, and had become very confused as to business matters).

The Court will not restate all of Defendants' evidence here. Most concisely, Defendants have provided the Court with a letter from Mr. Bradley's friend, Nancy Kunau. Kunau Letter (Dkt. 43-3 at 8-9). In this letter, Ms. Kunau, a nurse, describes her observations of Mr. Bradley's deteriorating mental state over the fall of 2018 and spring of 2019. For example, Ms. Kunau noticed that by early January 2019 Mr. Bradley "would be confused concerning the day of the week or events happening at the facility." *Id.* at 8. She also indicated that Mr. Bradley was "unable to follow any bank transactions," pay any bills, or "make sound, logical decision." *Id.* at 8-9. A reasonable jury could find that the person Ms. Kunau and other family, doctors, and friends described did not have the capacity to understand financial transactions as of February 26, 2019.[9] This, as well as Dr. Davidson's declaration, creates a genuine issue of material fact for trial regarding Mr. Bradley competency.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Farm Bureau Life Insurance Company's Motion for Summary Judgment (Dkt. 40) is **DENIED**.

DATED: April 18, 2022

Raymond E. Patricco
Chief U.S. Magistrate Judge

---

[9] Farm Bureau cites countervailing evidence, including Mr. Bradley's ability to effectively call and communicate with Farm Bureau representatives, to show that Mr. Bradley was not as incapacitated as his family claim. Pl.'s Rply at 7-10 (Dkt. 45). In highlighting Dr. Davidson's declaration and Ms. Kunau's letter, the Court expresses no opinion about the relative weight of the competing evidence regarding Mr. Bradley's competency. The Court simply views the evidence in the light most favorable to Defendants, as it must, and concludes that this evidence is sufficient to create a genuine issue for trial.

**MEMORANDUM DECISION AND ORDER - 16**